**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES E. RITTER, | ) | CASE NO. 1:23-cv-00498 |
| | ) | |
| Plaintiff, | ) | JUDGE DAVID A. RUIZ |
| | ) | |
| v. | ) | |
| | ) | |
| SCHINDLER ELEVATOR CORP., *et al.*, | ) | **OPINION AND ORDER** |
| | ) | |
| Defendants. | ) | |

## I.      INTRODUCTION

Plaintiff, James Ritter ("Ritter"), a twenty-three year employee of Defendant, Schindler Elevator Corporation ("SEC"), had his employment terminated on October 15, 2022, as part of a reduction in force ("RIF"). Ritter, who was age 53 at the time, (R. 1, PageID 6), sues his former employer under the Age in Employment Discrimination Act ("ADEA"), 29 U.S.C. §§ 629, *et seq.,* and the Ohio Fair Employment Practices Act ("OFEPA"), Ohio Rev. Code Chapter 4112. Ritter asserts SEC discriminated against him by denying him four positions for which he was the "best candidate with the best record," and because he was laid off when he "was a much better employee…than people who were not part of the RIF." (R. 17-1, PageID 278). He additionally asserts retaliation claims under 29 U.S.C. § 629 and Ohio Rev. Code § 4112.02(I) for sending his boss an email expressing disappointment he did not fit in with the "next generation" of SEC leaders, claiming he was terminated as a result. (*Id.* at 278-79, 347-48; R. 17-2, PageID 346).

The matter is before the Court on SEC's Motion for Summary Judgment. (R. 16). The matter has been fully briefed. (R. 16: R. 21; R. 25; R. 26; R. 28). The Court, as explained herein, finds that Ritter has failed to demonstrate a triable material issue of fact on any claim and grants the Motion for Summary Judgment thereby dismissing this case.

1

II.     <u>**FACTS**</u>

The Court construes the following facts in the light most favorable to Ritter as the nonmoving party. SEC hired Ritter in 1998 as a Sales Representative II in Pittsburgh, Pennsylvania. (R. 17-1, PageID 296; *see also* R. 1, PageID 3). In June 2001, SEC promoted him to Branch Manager in Madison, Wisconsin. (*Id.*). He became a District Manager in Cleveland, Ohio in January 2007, eventually becoming General Manager ("GM"). (*Id.* at 297). SEC promoted Ritter again to Area General Manager ("AGM")[1] of the Chicago, Illinois Territory in July of 2014. (*Id.*). In accepting this position, Ritter was required to relocate from Ohio. (*Id.)*. He was allowed to commute with the understanding he would move when his children graduated. (*Id.*). Eighteen months later, Ritter, dissatisfied with commuting, took a voluntary demotion – again becoming the Cleveland GM. (*Id.*). He served in this role from February 2016 until January 2017, when SEC promoted him to AGM of the Pittsburgh, Pennsylvania territory, which included Ohio. (*Id.*).

SEC created a new business transformation project, called Optimus, which was based out of the national headquarters (HQ) in Morristown, New Jersey. (*Id.* at 297-98; R. 22-2, PageID 1111-18). SEC offered Ritter the opportunity to become the Vice-President of Optimus. (*Id.*). Ritter accepted this position, effective July 1, 2018, reporting directly to former SEC President, Greg Ergenbright. (*Id.*). Although he received a 5% pay increase, this was a lateral transfer not a promotion. (R. 22, PageID 986-90; R. 22-2 at 1111-13).

The Optimus project failed for reasons not fully established in the record, and it was disbanded in early 2020. (R. 17-1 at 297-99). Paul Bloom, who was the Senior Vice-President

---

1       The title was changed to Territory Vice-President (TVP) (used hereinafter) when SEC shifted its focus from operational to client-based. (R. 18-1, PageID 432; R. 22, PageID 1050-51).

("SVP") of Area North[2] and a noted critic of Optimus, testified that field acceptance of Optimus was "difficult." (R. 17-1 at 299; R. 18-1, PageID 451). But he does not know why it was not successful, nor can say who was to blame. (R. 18-1 at 450-51). Rightly or wrongly, Ritter's reputation with the company suffered. (R. 16-1, PageID 137; R. 18-1 at 463-65).

Bloom was informed by SEC's former SVP of Human Resources ("HR"), Michael Yurchuk, and President Ergenbright that Optimus was not working out, and he needed to find a place for Ritter to land. (R. 18-1 at 452). So Bloom offered Ritter two opportunities: 1) Vice-President ("VP") of Mergers & Acquisitions ("M&A"); or 2) VP of Territory and District Operations ("floating TVP"). (R. 17-1 at 297-98; R. 18-1 at 453-54). Ritter chose the latter, concerned that the M&A role would be temporary. (R. 17-1 at 298; R. 18-2, PageID 591-92). He became a floating TVP on February 1, 2020, reporting to Bloom,[3] and supporting regions with management vacancies. (R, 17-1 at 298-99; R. 18-1 at 444, 448; R. 18-2 at 591).

Around the end of 2020, Ritter was voicing concerns about the longevity of the floating TVP role, expressing his desire for a permanent position. (R. 17-1 at 282-84; R. 18-1 at 492-93, 500). Ritter was actively seeking positions in Canada, but none were available. (R. 18-1 at 497; R. 18-2 at 674). Bloom informed Yurchuk and HR Representative, Kia James, "Jim is getting nervous. I'm dancing the dance, but we will need to give him opportunity." (*Id.*). Bloom tried to assist Ritter, but was unsuccessful.[4]

---

2        Bloom was later promoted to Chief Operating Officer ("COO"). (R. 18-1, PageID 428-30, 482; R. 22-1, PageID 108). He also served as Interim CEO for six months when Greg Ergenbright retired. (R. 18-1 at 430-31, 482).

3        Bryan Budnik accepted the VP, M&A role. (R. 18-1, PageID 442-43). At the time Ritter was laid off, which he contends was due to his age, Bloom, the same person who submitted Ritter's name for displacement, extended an offer for a TVP position to Budnik, who was then age 50. (*Id.*; R. 16-1, PageID 108). SEC argues this further discounts Ritter's age claims.

4        For example, in November 2020, Bloom contacted Alex McFarlane, SVP of Area East, inquiring about a possible position for Ritter. (R. 18-1 at 496-98; R. 18-2, PageID 675-76).

In the summer 2021, Ritter expressed interest in the then vacant Pittsburgh TVP position. (R. 18-1 at 468). Ultimately, SEC selected Jennifer Bowen, who was twelve years younger than Ritter. (*Id.*; R. 19-1, PageID 821). Bowen was referred to SEC through its recruiting firm, the Lunova Group. (R. 19-1 at 821-22, 838). She had managerial experience and had previously worked for a direct competitor, which was something SEC highly valued. (*Id.* at 815-19).

Bloom scheduled a planned development videoconference meeting with Ritter on September 24, 2021, to discuss this decision, along with Ritter's career path, and to examine developmental opportunities for Ritter's future with SEC. (R. 16-1 at 108; R. 17-1 at 294-95; R. 18-1 at 460-61; R. 18-2 at 593; R. 22 at 981; R. 22-6, PageID 1135). All of Bloom's reports received these reviews. (R. 22 at 981). But Bloom took the unusual step of inviting the head of HR to the meeting. Because this concerned Ritter, and because SEC did not interview him for the TVP position, which he had been previously "extremely successful" in, he surreptitiously recorded the meeting. (R. 17-1 at 284-85, 294-295; R. 18-1 at 461; R. 22 at 981).

Bloom and Yurchuk wanted Ritter to have career stability for the next ten years, so they attempted to be transparent with him. (R. 16-1 at 118-19, 121-23, 127-29; R. 16-3 PageID 239-41; R. 18-1 at 464, 468; R. 22 at 1000-01). Bloom informed Ritter there was limited "pull" within SEC for him and provided feedback about working on his leadership skills to increase his opportunities within the company. (R. 16-1 at 108, 115, 118-19, 121-23, 127-29).

Ritter acknowledged his reputational "brand" had suffered after Optimus's failure, suggesting it was close to being "in the toilet." (*Id.* at 137). Both Bloom and Yurchuk tried to steer Ritter away from seeking TVP jobs and into a different career direction. (*Id.* at 114-15, 118-20, 139-42; R. 18-1 at 466). As Bloom explained, Ritter held the role of TVP twice, once choosing to give it up, and then leaving the position to run Optimus, and to place him in that role a third time would be "very unusual." (R. 18-1 at 445, 464, 466). Bloom, who was around the

same age, (R. 17-1 at 293), told Ritter he was "still a young guy" and they had to "figure out a path in the long-term." (R. 16-1 at 136). Both he and Yurchuk told Ritter they believed his floating TVP was stable,[5] but strongly recommended he consider other positions in Finance or with SEC's Canada operations – as Ritter held dual-citizenship. (*Id.* at 115-17, 119, 124-26, 129; R. 16-2, PageID 169; R. 16-3 at 241-42). Yet Ritter apparently did not heed this advice. Instead, he continued to seek out vacant TVP positions. (R. 17-1 at 282).

For example, in May of 2022, the Chicago TVP position became available, which is the very position Ritter formerly held and voluntarily relinquished. (R. 17-1 at 279, 286; R. 19-1 at 852).[6] Jennifer Bowen sat on the hiring committee for that position. (R. 19-1 at 851; R. 22 at 1021). The committee interviewed several candidates, but Ritter was not one of them. (R. 19-2, PageID 908-09, 914-19). SEC offered the position to Blake Jolivette, an external candidate, on June 16, 2022.[7] (R. 18-1 at 477; R. 18-2 at 623-25; R. 19-1 at 852-53, 856; R. 22 at 1020-21; R. 22-27; R. 22-28; R. 24, PageID 1713). Jolivette was also referred to SEC by Christine Barber at Lunova. Excited by this prospect, Barber wrote, "Blake has been very loyal to [a competitor]…, this is the first time in 5 years of us reaching out that he has been open to speaking." (R. 18-2 at 622). The committee recommended Jolivette based, in part, on his quick wit, experience, ambition, leadership history and style, and his demeanor. (R. 18-2 at 523-28; R. 19-1 at 852; R.

---

5       That may have been their belief at the time. But by the time the RIF was implemented, Yurchuk had left SEC, and Bloom had transitioned into the COO role and was no longer SVP of Area North. (R. 22, PageID 1001-02).

6       It is unclear whether Ritter actually applied for this job. On May 19, 2022, Bloom sent an email to Michelle Bridges, an internal HR Recruiter, stating they needed to discuss Jason Vallee, Mike Sullivan, and Ritter. (R. 18-1, PageID 480-81; R. 18-2, PageID 628-30; R. 22-24, PageID 1365). Bridges replied, "Thanks Paul. So far, none of them have applied." (*Id.*).

7       Initially, SEC offered the job to Jason Vallee (R. 22-25, PageID 1367-68; R. 24, PageID 1713). Vallee had worked at SEC, but left to work elsewhere in 2021. (R. 18-2, PageID 620-21).

22-27, PageID 1371-74).

Bloom and Ritter discussed this position on July 6, 2022,[8] and the next day Ritter sent an email to Bloom, who was now the COO and Interim CEO, summarizing their conversation. (R. 17-1 at 278-79; R. 17-2 at 346-48; R. 18-1 at 510; R. 18-2 at 584, 634; R. 22-19; PageID 1197-99). In this email Ritter stated, "it was disheartening to hear that I do not fit in the next generation of leaders in SEC's eyes." (*Id.*). Bloom did not respond, and instead forwarded this email to HR and Legal with a note, "Awareness only. No action required." (R. 18-1 at 482; R. 18-2 at 532-33). Bloom believed Ritter was selectively "documenting" things, and he felt he needed support as it appeared Ritter was going down a "litigation route." (R. 18-1 at 482-83).

Seemingly growing more concerned for his job security, on September 12, 2022, Ritter sent Bloom another email, this time outlining his accomplishments. (R. 17-1 at 286; R. 17-2 at 397). Ritter knew "changes were coming," and he asked Bloom what was going to happen with his position. (R. 17-1 at 286). And one month later, the anticipated changes came. SEC terminated Ritter's employment on October 15, 2022, as part of a RIF. (R. 1, PageID 6; R. 17-1 at 274; R. 17-2 at 355-96). Bloom, in conjunction with other executives and HR, made the decision. (R. 16-1 at 108; R. 18-1 at 508-10). Ritter's floating TVP position was "nice to have," but SEC needed to cut costs as they were restructuring. (R. 18-1 at 508). After the group met multiple times, examining restructuring plans and RIF-related documents and debating the necessity of certain positions, the final RIF decisions were made. Ritter was the only person in a

---

8       Bloom does not recall speaking to Ritter on July 6th, stating that would seem unusual as he is normally out of town for the holiday. But he does not deny it. (R. 18-1, PageID 481-82).

floating TVP position at SEC,[9] and SEC eliminated this position. (*Id.* at 510-12).

Around this time, SEC promoted Jennifer Bowen to Bloom's old position of SVP Area North, which created a TVP vacancy in Pittsburgh. (R.18-1 at 485). After being let go, Ritter contacted Jeff Borland, a SEC retiree who was serving as the interim SVP of HR, expressing his interest. (R. 18-1 at 487; R. 19-1 at 942). Borland forwarded Ritter's email to Bloom asking for his thoughts. (R. 18-2 at 637). Bloom responded, "I RIF [sic] him on Friday so no waiting for him to sign [severance] package. Do not reply." (R. 18-1 at 487-88; R. 18-2 at 637).

Regardless, Jennifer Bowen was now the hiring manager for the position, (R. 19-1 at 826, 830, 834), and she selected Walter Czekaj (age 38), who began with SEC in 2013, and had worked his way up the ranks. (R. 16-4, PageID 265-66; R. 16-5, PageID 269; R. 18-1 at 486; R. 19-1 at 841; R. 22-29).[10] This was the last employment action before Ritter filed his discrimination charge, resulting in this case.

## III.    LAW AND ANALYSIS

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue of material fact exists when the admissible evidence – viewed in the light most favorable to the nonmoving party – "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Peffer v. Stephens*, 880 F.3d 256, 262

---

9       Several others had served as floating TVPs – Rich Ludwig, Doug Bender, Eric Barber, and Monte Lukov. (R. 18-1, PageID 435-37, 509; R. 22, PageID 1044-45). But Bloom had never had a floater in Area North; he created this job for Ritter. (*Id.*). The other floater positions were eliminated earlier. (R. 22-1, PageID 1615). Ritter was the only floating TVP left. (R. 18-1 at 436-37).

10      Bowen spoke with Ritter twice, once at Bloom's request. She determined then she would not hire Ritter as a TVP because she found his primary focus on finance and his taking full credit for regional successes "off-putting." (R. 16-4, PageID 265).

7

(6th Cir. 2018). The nonmoving party is required to set forth specific facts, which show there is a genuine issue for trial. *Moldowan v. City of Warren,* 578 F.3d 351, 374 (6th Cir. 2009).

### A. Age Discrimination

Under the ADEA, it is unlawful for an employer to "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age…." 29 U.S.C. § 623(a)(1). Similarly, under the OFEPA, it shall be an unlawful discriminatory practice:

> For any employer, because of the…age of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

Ohio Rev. Code § 4112.02(A).

As the language of these discrimination laws mirror one another, the Court analyzes the state law claims under the same framework as federal law. *See, e.g.*, *Mauzy v. Kelly Serv., Inc.*, 75 Ohio St.3d 578, 582 (1996); *Coryell v. Bank One Tr. Co. N.A.,* 101 Ohio St.3d 175, 179 (2004) ("Although we are not bound to apply federal court interpretation of federal statutes to analogous Ohio statutes, we have looked to federal case law when considering claims of employment discrimination brought under the Ohio Revised Code.") (citation omitted).

Ritter's alleged harm falls into two categories: (1) selection of substantially younger, less qualified persons for the TVP roles; and (2) elimination of his job. Under both state and federal law, age discrimination may be proven through direct and/or circumstantial evidence. But ultimately, Ritter has the burden to show SEC would not have taken these actions against him but for his age and/or engaging in protected activity. And while Ritter's termination may seem unfair, the proof he was terminated solely because he was in his early fifties is lacking.

### 1. Direct Evidence

Direct evidence is "that evidence which, if believed, requires the conclusion that unlawful

discrimination was [the] motivating factor in the employer's actions." *Wexler v. White's Fine Furniture, Inc.,* 317 F.3d 564, 570 (6th Cir. 2003) (en banc). "It does not require the fact finder to draw any inferences to reach that conclusion." *Amini v. Oberlin Coll.,* 440 F.3d 350, 359 (6th Cir. 2006) (citing *Nguyen v. City of Cleveland,* 229 F.3d 559, 563 (6th Cir. 2000)). "'[D]irect' evidence is 'smoking gun' evidence 'that explains itself.'" *Gohl v. Livonia Pub. Sch. Dist.*, 836 F.3d 672, 683 (6th Cir. 2016)*.* In other words, "[o]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age, satisfy this criteria." *Scott v. Potter*, 182 F. Appx. 521, 526 (6th Cir. 2006) (internal quotation marks omitted).

Courts use the following factors in assessing whether statements qualify as direct evidence: "1) whether the statements were made by a decision-maker or by an agent within the scope of his employment; 2) whether the statements were related to the decision-making process; 3) whether the statements were more than merely vague, ambiguous or isolated remarks; and 4) whether they were made proximate in time to the [adverse action]." *Peters v. Lincoln Elec. Co.,* 285 F.3d 456, 478 (6th Cir. 2002). No factor is dispositive. They are evaluated collectively. *Cooley v. Carmike Cinemas, Inc.,* 25 F.3d 1325, 1330 (6th Cir. 1994).

Discriminatory remarks by decision-makers and those significantly influencing the process can constitute direct evidence of discrimination. *Bartlett v. Gates,* 421 Fed. Appx. 485, 489 (6th Cir. 2010); *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 354 (6th Cir. 1998). But even then, "'only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age,' satisfy this criteria." *Scott,* 182 F. Appx. at 526 (quoting *Carter v. City of Miami,* 870 F.2d 578, 582 (11th Cir. 1989)). Additionally, statements unrelated to the decisional process do not demonstrate such animus. *Rowan v. Lockheed Martin Energy Sys., Inc.,* 360 F.3d 544, 550 (6th Cir. 2004).

Isolated, stray, general, vague, or ambiguous comments do not constitute direct evidence

of discrimination because "such remarks require a factfinder to draw further inferences to support a finding of discriminatory animus." *Sharp v. Aker Plant Servs. Grp., Inc.*, 726 F.3d 789, 798 (6th Cir. 2013); *Rowan*, 360 F.3d at 548-49 (employer's remarks about "need to lower the average age of workforce;" "the older people should go;" and "bring in some new blood," made years before employees' termination, were not direct evidence of unlawful age bias); *Sanders v. Lincoln Cnty., Tennessee*, 231 F. Supp. 3d 290, 296 (E.D. Tenn. 2017) (describing plaintiff as an "older man" did not constitute direct evidence of age discrimination).

In support, Ritter points to three conversations where Bloom asked Ritter about his intent to retire. (R. 21, PageID 956-61). The first occurred during the summer of 2021 at the Cincinnati Riverfront Park when Ritter expressed his interest in the Pittsburgh TVP position. (R. 17-1, PageID 292; R. 18-1, PageID 458). Ritter states Bloom asked him how much longer he intended to work, and when Ritter told Bloom he can't ask such things, Bloom responded, "well I'm asking it." (R.17-1 at 292-93). The second conversation, per Ritter, occurred during one of their monthly calls, with no specified date. (*Id.* at 293). The final occurred when Bloom told Ritter Brian Cave[11] was leaving the Chicago TVP role, and they discussed Ritter's interest, which likely occurred in the spring of 2022. (*Id.* at 294).[12]

Notably absent from these facts, which the Court weighs in Ritter's favor, is evidence that Bloom – or  anyone at SEC – told Ritter he was too old or that he would not receive a TVP appointment because of his age. In fact, the only direct comment Bloom made to Ritter about his *age*, is that "he is still a pretty young guy." (R. 16-1 at 136). That fact is undisputed, because

---

11      Brian Cave is about the same age as Ritter. (R. 17-4, PageID 354). He was the Chicago GM, who was promoted to TVP, serving from February 2020 to May 22, 2022. (R 18-1, PageID 455-57). He resigned to take a job with another company. (*Id.* at 441, 475).

12      Bloom could not recall any of these conversations, (*i.e.* R. 18-1, PageID 459-60), but does not deny they occurred. So the Court weighs this evidence as undisputed.

Ritter recorded it. This hardly reflects ageism, and in fact suggests the opposite.

And while the Court construes in Ritter's favor the evidence that Bloom asked Ritter about his plans to retire, most courts have held blanket inquiries about retirement do not constitute direct evidence of age discrimination. *Scheick v. Tecumseh Pub. Schs.,* 766 F.3d 523, 531 (6th Cir. 2014) (statement about Board wanting plaintiff to retire "would require an inference to conclude that retirement was a proxy for age"); *Lefevers v. GAF Fiberglass Corp.*, 667 F.3d 721, 724 (6th Cir. 2012) (questions concerning retirement plans, without suggesting employee retire, did not alone constitute direct evidence of age discrimination); *Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A.,* 12 F.3d 1382, 1395 (6th Cir. 1993) (finding suggestions by law firm shareholders that an attorney retire was not sufficient to support a finding of age discrimination); *Woythal v. Tex–Tenn Corp.,* 112 F.3d 243 (6th Cir. 1997) (questions about retirement were not an attempt to pressure plaintiff).

As the Sixth Circuit noted in *Scott v. Potter:*

> '[R]etire' usually brings to mind a voluntary separation from employment based on, among other things, an employee's years of service. Yet, 'years of service' is conceptually distinct from 'age.' While both terms apply to many of the same individuals in various contexts, the overlap is not perfect. An older employee might, for example, be a new hire with a particular employer, and therefore have only a couple of years of service. Alternatively, a younger employee might have worked at one employer since graduating high school, and therefore have a relatively long period of service…. In short, 'retire' and 'age' are not synonyms.

182 F Appx. at 526 (citing *Davidson v. Quorum Health Group, Inc.,* 1 F. Supp.2d 1321, 1325 (N.D. Ala. 1997) (finding statement "you are old enough to retire, you ought to get on out of here" disparaging, but not direct evidence of discriminatory animus)).[13]

Finally, Ritter relies on his own email to Bloom apparently following a July 6, 2022

---

[13]     Conversely, advising someone an employer "wants someone younger" does constitute direct evidence. *Scheick,* 766 F.3d at 531 (statement was not ambiguous and does not require an inference about age); *Sharp,* 726 F.3d at 794 (informing plaintiff employer picked another candidate because he was "younger" was not ambiguous).

11

conversation where he expressed his disappointment that he did not fit in with the "next generation" of SEC leaders. (R. 16-2, PageID 177; R. 17-2, PageID 346). In this email Ritter proceeds to document his employment history; express his desire for job security; and protest feedback provided by the TVP of Kansas City, explaining his version of the events. (*Id.*).

However, when evaluating the reference to the "next generation of leadership" comment, statements, such as a company is a "young, vibrant [] organization" and "it is time for the next generation," much like comments about retirement, are not enough to establish direct evidence of age discrimination. *Morgan v. New York Life Ins. Co.,* 559 F.3d 425, 432-33 (6th Cir. 2009) (citing *Smith v. E.G. Baldwin & Assoc., Inc.*, 119 Ohio App. 3d (Ohio Ct. App. 1997)); *but c.f. Belew v. SECO Architectural Sys., Inc.,* No. 3:16-CV-214, 2017 WL 2870114, at *6 (E.D. Tenn. July 5, 2017).

The Court finds all asserted statements attributed to Bloom – accepted as true and construed in Ritter's favor – do not establish SEC discriminated against Ritter because of age.

### 2. Indirect or Circumstantial Evidence

#### a. *Ritter can establish a prima facie case of age discrimination on the TVP positions, but not the RIF.*

As outlined above, a case based on direct evidence is difficult to establish. *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997) ("It is the rare situation when direct evidence of discrimination is readily available ...."). "[T]hus victims of employment discrimination are permitted to establish their cases through inferential and circumstantial proof." *Id.* This is known as the *prima facie* case, which was first established in the landmark decision of *McDonnell Douglas Corp. v. Green,* 411 US. 792 (1973). To set forth a *prima facie* case of age discrimination, Ritter must establish the four elements of the well-known *McDonnell Douglas* test: 1) he was a member of a protected class; 2) he suffered an adverse action; 3) he was qualified for the position(s) held; and 4) someone "substantially younger" was treated more

favorably or replaced him. *See Allen v. Highlands Hosp. Corp.,* 545 F.3d 387, 394 (6th Cir. 2008) (citing *Minadeo v. ICI Paints,* 398 F.3d 751, 764 (6th Cir. 2005)); *see also Kohmescher v. Kroger Co.,* 61 Ohio St. 3d 501 (1991) (applying factors in age discrimination claim under state law).

Ritter was 53 when his employment was terminated, well over the age of 40, the threshold for protected status. He suffered an adverse action. He was qualified for the positions he held. In analyzing the fourth element, he was not hired for certain TVP positions, while substantially younger persons were. But he cannot prove SEC replaced his position after the RIF.

### i.      *The TVP Positions*

Ritter points to four missed TVP opportunities – Pittsburgh (Jennifer Bowen – hired October 2021); Kansas City (Ashley Timmons – hired December 2021);[14] Chicago (Blake Jolivette – hired Summer 2022); and Pittsburgh (Walt Czekaj – hired October 2022).[15] He argues had he received one of those appointments, he would not have been laid off. His asserted comparators, Bowen (born in 1982), Timmons (born in 1987), Jolivette (born in 1991), and Czekaj (born in 1984), are all substantially younger. (R. 17-2, PageID 354). *Blizzard v. Marion Tech. Coll.,* 698 F.3d 275, 283 (6th Cir. 2012) (finding 6.5 year age difference was sufficient to create a material issue of fact) (citing *Grosjean v. First Energy Corp.,* 349 F.3d 322, 340 (6th Cir. 2003)). Thus, Ritter can establish a *prima facie* case regarding those positions.

---

14      Timmons was promoted to TVP after serving as GM of Denver and Kansas City. (R. 18-1, PageID 434-74; R. 19-1, PageID 856; R. 22-10, PageID 1143). While she is a listed comparator, there is no evidence Ritter applied for this position, or expressed interest in it.

15      SEC alleges that the Court should automatically dismiss claims accruing prior to February 19, 2022, as they would be beyond the 300-day statute of limitations required for federal EEOC filings. (R. 16, PageID 104). Persons have two years to file state-based employment charges with the Ohio Civil Rights Commission, and the statute is tolled during the investigation. The OCRC maintains a work sharing agreement with the EEOC, under which the OCRC investigates "dual-filed" charges. Ritter's charge, filed on December 17, 2022, was dual-filed. Therefore, all assertions are timely. (R. 1, PageID 2, ¶ 6; R. 17-2, PageID 416-21). *See* Ohio Rev. Code § 4112.051(C)(2); Ohio Admin. Code §§ 4112-3-01(D)(1), 4112-3-17.

### ii.     The RIF

Ritter's position was eliminated as part of a nationwide RIF in October 2022. A dozen out of approximately 6,500 employees nationwide were let go. (R. 22, PageID 1029). Downsizing and corporate reorganizations were routine at SEC, which – according to Ritter – happened almost yearly. (R. 17-1, PageID 299). For example, in early 2020, SEC offered a voluntary early retirement program (VERP) incentive, which 165 employees accepted.[16] (R. 18-1, PageID 512; R. 22, PageID 1010, 1305; R. 22-36, PageID 1484-77). Additionally, in late 2021, the company eliminated 100 positions, 32 through RIF downsizing, and the rest through terminations, reclassifications, or transfers to Global roles. (R. 18-1 at 512; R. 22 at 1012-13; R. 22-1, PageID 1182-86; R. 22-17, PageID 1179-86).

When Bloom and Yurchuk met with Ritter on September 24, 2021, they foreshadowed his position was temporary. And the record indicates in early 2022, SEC was planning a corporate restructure, with intention to introduce a new organizational model. (R. 22-31, PageID 1379-81). On March 17, 2022, Kia James sent an email to Bloom and Yurchuk, outlining Area North proposed reductions, indicating in relevant part: "Jim Ritter to run Minneapolis until 7/1. Unless there is a GM that leaves, he will not have a role in AN." (R. 18-2, PageID 714). She asked Bloom if she was to add Ritter's name to the RIF List. (R. 18-1 at 501-03; R. 18-2 at 712-13; R. 22-15, PageID 1174-75). Bloom had not yet made that decision. (R. 18-1 at 503).

As of June 29, 2022, executives at SEC (Robert Pierce, Sneh Virdie, and Paul Bloom) had an initial proposal for the planned RIF. (R. 18-2, PageID 716-19). Pierce wrote: "Please note

---

16      The VERP incentivized employees 55 and older to retire in exchange for pay and benefits. (R. 22, PageID 1040-41; R. 22-1, PageID 1474-78; R. 22-36). Despite Ritter's intimation, the offering of such programs does not constitute age discrimination. *See Wilson v. Firestone Tire & Rubber Co.*, 932 F.2d 510, 514 (6th Cir. 1991); *Hieber v. Oakland Cnty.,* 136 F.4th 308, 330 (6th Cir. 2025); *Ramacciato v. Argo-Tech Corp.*, 2005-Ohio-506, ¶19-20, 2005 WL 315377 (Ohio Ct. App. Feb. 10, 2005).

we had talked about [J.D.] (Director of Next Gen SV Tech) and/or Jim Ritter." (*Id.* at 716). But Ritter's name was still on HR's "Top Talent List/Retention Plan List," a list of persons with whom to conduct stay interviews for the purpose of retaining company talent. (R. 18-1 at 505; R. 22 at 1017-18; R. 22-18, PageID 1195; R. 22-19, PageID 1197-99; R. 22-20, PageID 1213-14, 1257; R. 22-21, PageID 1308). And as of August 23, 2022, Bloom was still trying to find positions for Ritter and another employee, [P.P.], whose names were both on the *potential* 4th quarter RIF List.[17] (R. 18-2 at 737). But by the end of August, Ritter's name was removed from the Top Talent List at Kia James' suggestion. (R. 22 at 1018; R. 22-22, PageID 1316, 1360; R. 22-23, PageID 1363). And in a matter of weeks before the RIF List was finalized, Ritter's name was added to it. (R. 18-1 at 511).

As the Sixth Circuit has held, "a plaintiff whose employment position is eliminated in a corporate reorganization or work force reduction carries a heavier burden in supporting charges of discrimination than does an employee discharged for other reasons." *Ridenour v. Lawson Co.,* 791 F.2d 52, 57 (6th Cir. 1986). As long as employers do not act with discriminatory intent, they may eliminate positions for economic or efficiency reasons, even when the jobs are held by older workers. *See Barnes v. GenCorp Inc.,* 896 F.2d 1457, 1469 (6th Cir. 1990) ("[A]n employer has no duty under the ADEA to permit an employee to transfer to another position or displace workers with less seniority when the position is eliminated as part of a work force reduction").

Ritter challenges his termination by first arguing this was not a true RIF because only

---

17      Ritter was the only direct report of Bloom on the RIF List. P.P. was the former TVP of Kansas City, who was removed from that job in early 2022 for unrelated reasons. (R. 18-1, PageID 469, 495, 505). At the time of the RIF, P.P. was the VP of Business Transformation, reporting to M.R., whose position was also on the RIF List. (*Id.* at 717-18).

thirteen[18] persons were let go. (R. 21, PageID 952). A work force reduction situation occurs when "business considerations cause an employer to eliminate one or more positions within the company." *Geiger v. Tower Auto.,* 579 F.3d 614, 623 (6th Cir. 2009). This certainly did occur. So Ritter must present "direct, circumstantial, or statistical evidence that age was a determining factor in his job displacement." *Ridenour,* 791 F.2d at 57. Absent such evidence, SEC was free to reorganize and eliminate jobs in whatever lawful manner it chose. *Wilson v. Firestone Tire & Rubber Co.,* 932 F.2d 510, 517 (6th Cir. 1991); *Geiger,* 579 F.3d at 622-23 (citing *Barnes,* 896 F.2d at 1465)).

Critical to Ritter's *prima facie* case, an employee is only replaced in a RIF when another employee is hired or reassigned to perform his or her duties. *Wilson v. State of Ohio, Dep't of Job & Family Servs.,* 178 Fed. Appx. 457, 465 (6th Cir. 2006) (combining two positions into one "clearly does not meet the definition of replacement," nor does one employee absorbing the duties of another worker). *See also Campbell v. PMI Food Equip. Group, Inc.,* 509 F.3d 776, 785-86 (6th Cir. 2007); *Barnes,* 896 F.2d at 1465; *Hill v. F. Health,* 167 F. Appx. 448, 455 (6th Cir. 2006). Ritter does not assert SEC filled his position with another person after the RIF. Therefore, he does not fully establish a *prima facie* case on the RIF claim.

But Ritter also challenges the RIF as discriminatory through the use of his own asserted statistical data, arguing the "average age" of those laid off was 52. (R. 21 at 960-61). The positions/ages of those marked on the RIF List are as follows:

| Position | Location | Age | RIF DATE |
|---|---|---|---|
| Senior Vice-President, Area Operations | Miami, FL | 47 | 10/15/22 |
| Vice-President, Large Area Projects | New York City, NY | 62 | 11/15/22 |
| Senior Sales Representative | New York City, NY | 62 | 10/15/22 |
| Executive Administrative Assistant | Morristown, NJ | 60 | 10/15/22 |
| Executive Admin. To MKL Zone AM | Morristown, NJ | 55 | 10/15/22 |

---

18      It is not clear to the Court if the number of positions eliminated was twelve or thirteen. Both numbers are referenced, and Court found twelve positions demarcated in the record, but the numerical distinction does not impact this analysis.

| Senior VP/Chief Transformation Officer | Morristown, NJ | 48 | 10/15/22 |
|---|---|---|---|
| Director of Engineering | Morristown, NJ | 58 | 10/01/22 |
| *Vice-President, Territory & District Ops | Cleveland, Ohio | 53 | 10/15/22 |
| Director, Next Generation SV Tech. | Holland, Ohio | 50 | 08/15/22 |
| Associate Engineer | Hanover, Pennsylvania | 26 | 10/15/22 |
| Logistics Facilitator | Hanover, Pennsylvania | 42 | 10/15/22 |
| Vice-President, Large Area Projects | Houston, Texas | 55 | 10/15/22 |

(*Denotes Ritter) (R. 16-2, PageID 180-222; R. 17-2, PageID 355-96; R. 22 at 1028-29).

While statistical data may be used to support an inference of discrimination, "the statistics must show a significant disparity and eliminate the most common nondiscriminatory explanations for the disparity." *Anderson v. Otis Elevator Co.,* 923 F. Supp. 2d 1032, 1061 (E.D. Mich. 2013); *Barnes,* 896 F.2d at 1466-67 (citing *Segar v. Smith,* 738 F.2d 1249, 1274 (D.C. Cir. 1984), *cert. denied,* 471 U.S. 1115 (1985)). "[B]oth the methodology and the explanatory power of the statistical analysis must be sufficient to permit an inference of discrimination." *Simpson v. Midland–Ross Corp.,* 823 F.2d 937, 944 (6th Cir. 1987)). Courts within the Sixth Circuit have upheld inferences of discrimination, but only typically where data is offered alongside analyses describing the statistical significance. *Thompson v. Fresh Prods., LLC,* 985 F.3d 509, 526-27 (6th Cir. 2021) (citing *e.g. Barnes*). The Circuit also recognizes "the importance of sample size, finding relatively small sample sizes to be suspect and incapable of supporting an inference of discrimination." *Id.* (citing *Peeples v. City of Detroit,* 891 F.3d 622, 635 (6th Cir. 2018) (finding sample size of 27 insufficient); *Simpson v. Midland-Ross Corp.*, 823 F.2d 937, 943 (6th Cir. 1987) (finding sample size of 17 "suspect")).

The *Thompson* Court found the plaintiff failed to explain the significance of the data offered, and the sample size of a handful of terminated employees was too small to provide reliable data. As in *Anderson* and *Thompson,* Ritter's "statistical evidence" falls far short of the type used in *Barnes* and other cases, such as *Scott v. Goodyear Tire & Rubber Co.,* 160 F.3d 1121 (6th Cir. 1998), where the evidence sufficiently established a *prima facie* case under the

17

heightened standards applicable in a RIF.

Here, unlike the evidence in *Barnes* and *Scott,* Ritter's "statistical" information is presented through arguments of his counsel, not the opinion testimony of an expert. Ritter examines the RIF with a narrow eye of the median or average age of those let go. The "statistical evidence" of the average age of twelve RIFed employees fails to eliminate SEC's explanations for Ritter's discharge—he was the only floating TVP left, and the position was eliminated.

In addition, examining this data alone, four employees were substantially younger than Ritter, three were substantially older, and four were within five years of his age. But this is a small part of a story. Ritter provides no evidence of the work force composition, the various job classifications, regionally, nationally and internationally, or the ages of all persons within those classifications. There is no expert testimony pertaining to expected values, confidence levels, or standard deviations, or any methodology or statistical analysis whatsoever. *See NAACP v. City of Mansfield,* 866 F.2d 162, 168 (6th Cir.1989); *Simpson v. Midland–Ross Corp.,* 823 F.2d 937, 944 (6th Cir.1987) ("both the methodology and the explanatory power of the statistical analysis must be sufficient to permit an inference of discrimination") (citation omitted).

Ritter does not provide the "modified or heightened…additional direct, circumstantial, or statistical evidence" required in a RIF case. *Anderson,* 923 F. Supp.2d at 1055. He therefore cannot create an inference of discrimination because the metrics, typically utilized in statistical cases, are absent. Simply put, without more, the Court cannot make the statistical leap Ritter seeks to bolster an unsupported contention that SEC eliminated the dozen or so positions to remove him—or other employees—because of age.

**b.   SEC asserts legitimate nondiscriminatory reasons for its actions.**

Once the plaintiff properly demonstrates a *prima facie* case, the burden of production shifts to the employer to articulate a legitimate nondiscriminatory reason for its actions.

*Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 814-15 (6th Cir. 2011) (citing *Texas Dep't. of Cmty. Affairs v. Burdine*, 450 U.S. at 248, 254 (1981)).

SEC makes three primary arguments in defense of its selections. First, it relies on Bloom and Yurchuk's informing Ritter that after the Optimus failure, there was no corporate "pull" for him to move higher within the company. In other words, other managers and executives within the company no longer had faith in him as a leader, particularly in field operations. And because of this negative image, they needed to help Ritter work on his reputational "brand" by brainstorming other potential jobs, which would allow him to change their perceptions. Ritter recorded this conversation. He cannot deny it, and it is clear. Bloom and Yurchuk, attempting to bolster Ritter's credibility within the company, explained to him that because of this negative image, he would not be considered for any further TVP positions and needed to focus his energies on finding a position elsewhere within SEC to re-brand or re-invent himself and further his career. The seeming denial or unwillingness to appreciate the rationale does not make it pretextual.

Second, SEC argues it would not consider Ritter for another TVP position because this was an "unusual" step backwards, and HR and his managers were trying to find a different trajectory path for him. Again, Ritter's insistence on applying for TVP positions does not negate this. Finally, it alleges Ritter did not want to relocate, based on his history of leaving the Chicago position, coupled with more current statements to Bloom. Undeniably, the TVP role requires geographic mobility. (R. 24, PageID 1710).

And with respect to the RIF, SEC eliminated a dozen or so positions in October of 2022 due to a company restructure. SEC argues Ritter was in a temporary position, which was not critical to company operations, so this position (not the person) was selected for the RIF.

19

### c.   *The employee has the burden to prove the reasons are pretextual, and Ritter's evidence fails to create a material factual issue that discrimination was the real reason for SEC's actions.*

Upon articulation of a non-discriminatory reason for the employment decision, the employee must demonstrate such reason is pretextual, meaning it is false. *Provenzano,* 663 F.3d at 815 (citing *Burdine,* 450 U.S. at 256). This is accomplished "by showing that the proffered reason: 1) has no basis in fact; 2) was not the actual reason or did not actually motivate the challenged conduct; or 3) was insufficient to explain the employer's action or warrant the challenged conduct." *Wexler,* 317 F.3d at 576 (citing *Dews v. A.B. Dick Co.,* 231 F.3d 1016, 1021 (6th Cir. 2000)); *Johnson v. Kroger Co.,* 319 F.3d 858, 866 (6th Cir. 2003).

In *Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167 (2009), the Supreme Court held a plaintiff must prove, by a preponderance of the evidence, that age was the "but-for" cause of the challenged adverse employment action.[19] Thus, "'because of age' means that age was the 'reason' that the employer decided to act." *Univ. of Texas Sw. Med. Ctr. v. Nassar,* 570 U.S. 338, 339 (2013) (extending *Gross* to retaliation claims). Therefore, under § 623(a)(1) of the ADEA (and by implication § 4112.02), Ritter retains the burden of persuasion that age was the "but-for" reason SEC decided not to select him for the TVP positions, then decided to terminate his employment, which is an uphill challenge he cannot sustain.

### i.   *Ritter's Corporate Image Post-Optimus*

Ritter's intimation that he was wrongfully victimized over the failure of Optimus carries no weight. Despite this being a lateral move, he was named the project lead, receiving a 5% pay

---

19     Prior to 2009, courts allowed for mixed-motive cases and a less stringent standard of "motivating factor." *See, e.g.*, *Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989); *Laderach v. U-Haul of NW. Ohio,* 207 F.3d 825, 829 (6th Cir. 2000). But this changed when the Supreme Court set a higher standard for proving age discrimination, specifically holding that the "burden of persuasion does not shift to the employer to show that it would have taken the action regardless of age, even when a plaintiff has produced some evidence that age was one motivating factor in that decision." *Gross*, 557 U.S. at 180.

increase and reporting directly to SEC's President. (R. 22-2, PageID 1111-18). The record is devoid of who or what attributed to this failure, but the corporate perception was Ritter was responsible. (R. 16-1, PageID 138; R. 18-1, PageID 450-53).

It is clear to the Court that Bloom's use of the phrase he has "kicked the can" multiple times during the September 24, 2021 meeting meant he had been putting off the difficult conversation they were about to have. (R. 16-1 at 115-17, 119, 124). During this meeting, Bloom told Ritter he was not going to get a permanent TVP position. (R. 18-1 at 464-65). Bloom thought all along Ritter would get pulled for another position, but he wasn't, so, they wanted to give Ritter "honest feedback," have a "transparent conversation," and discuss the need to "reinvent or rebrand Jim." (R. 16-1 at 114-15; R. 18-1 at 463-65). Bloom advised Ritter he was not getting the Pittsburgh TVP position because the "committee was going in a different direction" by hiring Jennifer Bowen. (R. 16-1 at 114, 140; R. 18-1 at 464).

Both Bloom and Yurchuk found Ritter capable in the floating TVP role, but wanted to "figure out how [they] could get [him] out of the kind of stuck-right-here role." (R. 16-1 at 115, 119). So they discussed potential jobs at HQ and in Canada but cautioned they were not "getting pull to pull [him] up to TVP or higher levels." (*Id.* at 117-19, 126-27; R. 18-1 at 464). Bloom shared he had approached the CFO, Sneh Virdie, about positions in Finance. (R. 16-1 at 115-17, 119; R. 18-1 at 503). Although Bloom and Yurchuk indicated they had a positive impression of Ritter, they also told him that other company leaders did not have the same perception of him; there was "not a lot of cohesion there…." (R. 16-1 at 117, 126, 129). They sought to give Ritter clarity around where potential opportunities were. (*Id.* at 121).

Ritter replied he was "disappointed to hear this," and having a "disconnect, [he needed them] to help fill that in for [him]." (R. 16-1 at 119-20, 122, 134). He defended his performance, and again reiterated he wanted to be in a field role. (*Id.* at 120-22). Bloom attempted to explain

21

again: "The challenge, whether it's a brand issue, whatever it is, there is not a pull for me to get you a TVP role or a finance role within Schindler." (*Id.* at 122-23). Yurchuk presented the information in a basketball analogy, suggesting Ritter was the versatile team member, who could play any position, but sat the bench because even though he is as talented as the starters, the "perception" that he is not, keeps him on the bench. (*Id.* at 123-24).

They offered to help Ritter. (*Id.* at 125, 134, 138, 141). Yurchuk indicated we need to think of the next opportunities where you can demonstrate your strengths but cautioned, "to wait and hope for the next TVP…it's…not going to shift enough. We need to get you that exposure[]" and suggested different career opportunities to consider. (*Id.* at 125). Bloom could not have been more direct when he said: "This (floating TVP position) is not a ten-year assignment…putting your hand up for TVP, I don't think that's where you want to be, actually. You told me I want a more defined career path…growth…next level. And that's what this conversation actually is…I just want to declutter the two." (*Id.* at 136). He wrapped up the conversation, telling Ritter, "You're still a young guy. We got to figure out the path on a longer term and then the stuff beyond that." (*Id.*). Ritter reminded them he didn't volunteer for Optimus and now his "brand is completely, not necessarily in the toilet, but pretty close with certain people on the committee that are going to make decisions going forward with TVP." (*Id.* at 137). Believing he was "head and shoulders above all the candidates," he acknowledged, "that's not ever going to be an opportunity." (*Id.* at 140).

### ii.     *Step Backwards / Refusal to Relocate*

Whether it was a mistaken belief, SEC leadership was under the impression Ritter, though willing to travel for work, was unwilling to relocate, as HR noted in a succession planning document. (R. 18-2, PageID 667-70). Perhaps this was based on Ritter's prior act of stepping down from the Chicago TVP role, Bloom's asserted conversations with Ritter to that

effect, or both. (R. 18-1, PageID 434-44, 475-77). And while the Court acknowledges Ritter's assertion that his circumstances had changed, and he was willing to secure an apartment in Chicago, (R. 17-1, PageID 294), the fact remains it was clear, as explained in the September 2021 conversation, Ritter would not be considered for the Chicago – or any other – TVP position.

And with respect to SEC being unwilling to allow Ritter to step backwards, Ritter points to two employees, who held a TVP role more than once—Otto Leone and Monte Lukov. (R. 17-1 at 295-96; R. 18-1 at 436-37; R. 19-1, PageID 383, 858). Both employees are older than Ritter, (R. 17-2, PageID 354), and remain employed at SEC. (R. 18-1 at 436-37). Therefore, they are not appropriate comparators. And again, such assertions are marginal because Yurchuk and Bloom clearly informed Ritter the reasons he would not be considered for a third TVP job.

### iii.     Qualifications Evidence

Ritter asserts – as the primary basis for pretext – the four candidates selected for TVP positions were all less qualified. In challenging these selections, Ritter points to the TVP position description ("PD"), heavily relying on the job's minimum qualifications, specifically the requisite minimum work experience of 10-15 years[20] in the elevator or another service-oriented industry, and a ten-year minimum of managing P&L (profit & loss) for an industrial company. (R. 18-2, PageID 594-95; R. 19-2, PageID 901-02). A PD, however, is a guidepost and not the road's end. As SVP Jennifer Bowen testified, she has sat on hiring panels, including the panel for the Chicago TVP interviews, and was the decision-maker for the Pittsburgh position. (R. 19-1, PageID 846, 851-52). She uses the PD as a "guide" and does not necessarily hold the requirements as "mandatory." (*Id.* at 844, 849, ref. R. 19-2, PageID 901-02).

---

20     At some point, this requirement was changed from a requisite 7-10 years. (R. 19-2, PageID 901; R. 22-8, PageID 138-39).

As the Sixth Circuit has held, "employers are not rigidly bound by the language in a job description." *Wrenn v. Gould,* 808 F.2d 493 (6th Cir. 1987); *Yandal v. DENSO Air Sys. Kentucky,* No. 5:22-CV-00033, 2024 WL 114014, *5 (E.D. Ky. Mar. 15, 2024) (quoting *Browning v. Dep't of Army,* 436 F.3d 692, 696-97 (6th Cir. 2006) (finding selected candidate lacked the qualifications in the job description offered "little, if any, support for claim of pretext")). As aptly put by the *Wrenn* Court, "the employer's motivation, not the applicant's perceptions, or even an objective assessment [ ] of what qualifications are required for a particular position," is key to the discrimination inquiry. 808 F.3d at 502. *See also Young v. Oakland Cnty*., 176 F. Appx. 644, 650 (6th Cir. 2006) ("[R]easonable employers do not ordinarily limit their evaluation of applicants to a mechanistic checkoff of qualifications required by the written job descriptions").

Ritter attempts to distinguish *Browning* and *Yandal*, arguing he was far more qualified than the four candidates selected, and SEC fails to "identify a single area – other than the subjective criteria – that would support its decision to…dramatically deviate from its own minimum job requirements." (R. 26, PageID 1825). But "Title VII (and by implication, the ADEA) does not diminish lawful traditional management prerogatives in choosing among qualified candidates." *Wrenn*, 808 F.2d at 502 (citing *United Steelworkers of America v. Weber,* 443 U.S. 193, 207 (1979)). So long as its reasons are not discriminatory, an employer is free to choose among qualified candidates. *Id.* (citing *Burdine,* 450 U.S. at 259; *Canham,* 666 F.2d at 1061)); *see also Refaei v. Ohio State Univ. Hosp*., 2011-Ohio-6727, 2011 WL 6916460 ¶ 33 (Ohio Ct. App. Dec. 27, 2011). This is particularly so when selecting managers, as is the case here. *Ackerman v. Diamond Shamrock Corp.,* 670 F.2d 66, 70 (6th Cir. 1982); *Ullmann v. State,* No. 03AP-184, 2004-Ohio-1622 ¶ 33 (Ohio Ct. App. 2004) (quoting *Ackerman,* 670 F.2d at 70)).

SEC had a growth objective by obtaining talent from the competition. (R. 18-1, PageID 489; R. 22-35 PageID 1461, 1473). And in two of the four contested hiring decisions, SEC did so

24

by hiring Bowen and Jolivette. As Sachin Bhiwapurkar, a Senior HR Representative, explained, SEC relies on recruiters to find candidates who match how it is trying to fill positions. (R. 23, PageID 1670). For existing positions, as those at issue, "the intake meeting [between the recruiter and] hiring manager… is more critical than only looking at the job description." (*Id.*).

Consequently, Ritter may not simply substitute his own business judgment for that of SEC. It is undisputed that Ritter was a high performer – rated a B+ out of a five-point scale[21] – and the past winner of a corporate award. (R. 18-1, PageID 492, 499; R. 18-2, PgID 677; R. 22-1, PageID 1109). But even though Ritter's employment record is commendable, the Sixth Circuit has instructed that "when qualifications evidence is all (or nearly all) that a plaintiff proffers to show pretext, the evidence must be of sufficient significance itself to call into question the honesty of the employer's explanation." *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 627 (6th Cir. 2006). Evidence that a rejected applicant was as qualified, or better qualified, than the successful candidate is, standing alone, insufficient to overcome the employer's proffered non-discriminatory rationale. *Id.* (citing *Jordan v. City of Gary, Ind.,* 396 F.3d 825, 834 (7th Cir. 2005)).

In this case, where probative evidence of discrimination is lacking, Ritter's qualifications must be "so significantly better than the successful applicant's qualifications that no reasonable employer would have chosen the latter applicant over the former." *Bender,* 455 F.3d at 628. "A laxer standard would move this court from its proper role of preventing unlawful employment practices to the illegitimate role of acting as a 'super personnel department,' overseeing and second guessing employers' business decisions." *Id.* at 627-28 (citing *Verniero v. Air Force Acad.*

---

21      SEC conducted regular performance reviews, sometimes twice a year. The general rating scale ranged from A, B+, B, C- and D (no C ranking) (R. 23, PageID 1675)**.** A ranking of B means the employee meets expectations. (*Id.*). All new employees were ranked as a B for the first year. (R. 19-1, PageID 829-31). Ritter was consistently ranked a B+. (R. 22 at 1010).

*Sch. Dist. No. 20,* 705 F.2d 388, 390 (10th Cir. 1983)).

The Court cannot – and will not – superimpose its judgment as to the qualifications of Bowen, Timmons, Jolivette, and Czekaj. Each had a unique knowledge base, experience, and skill set upon which SEC placed high value. The evidence does not support the legal premise that Ritter's asserted superior qualifications are so significant that SEC's proffered employment decisions are false. At the summary judgment stage, "[the plaintiff] must set forth evidence from which a reasonable juror could reject [the employer's] explanations…and infer that [the employer] instead made its decision on the basis of [the plaintiff's] age." *Browning*, 436 F.3d at 696 (citing *Braithwaite v. Timken, Co.*, 258 F.3d 488, 494 (6th Cir. 2001)). Ritter has not satisfied his burden; and the Court finds the evidence and the related arguments fail to create a material issue fact regarding this standard.

### iv.      *Other Evidence – Comments and Corporate Programs*

Ritter also challenges SEC's succession planning, intimating because he was not considered as an immediate succession candidate, this somehow proves he was forced out due to his age. (R. 22, PageID 996-97). In doing so he references comments describing younger workers as having a "long runway" or "upward mobility." As explained by internal Recruiter, Michelle Bridges, this represents an employee is doing well in his or her current position and has potential – based on abilities – to go to other (typically higher-level) positions, not how much longer an employee will work. (R. 24, PageID 1708-09). Similarly, Jennifer Bowen explained, in her mind, "runway," a term used in succession planning discussions, is not a reference to age, longevity or retirement, but an employee's ability to take on higher or additional roles. (R. 19-1, PageID 861). And as Senior HR Director, Sachin Bhiwapurkar, testified, "[a]ge is never a part of discussion in any of [SEC's] succession metrics." (R. 23, PageID 1672).

In support, Ritter cites the case of  *Sharp v. Aker Plant Servs. Grp., Inc.,* 726 F.3d 789,

26

798 (6th Cir. 2013). There, after terminating an older employee and retaining a younger one, the supervisor explained his action by stating, "we're all going to retire and I had an opportunity to bring the next generation in, so that's what we decided to do." *Id.* at 799. The Sixth Circuit described this as a "retrospective description of the decision-making process that led to the terminations." *Id. See also Belew v. SECO Architectural Sys., Inc.,* No. 3:16-cv-214, 2017 WL 2870114, at *5-6 (E.D. Tenn. July 5, 2017) (denying summary judgment after considering circumstantial evidence of, *inter alia*, the company president's description of veteran employees as "long timers" who are not "spring chickens," while touting his "young guns" as "the next generation of foreman and crew leaders").

The Court concurs that, depending on the case's underlying factual record, such comments *could* be circumstantial evidence sufficient to overcome summary judgment. *See, e.g.*, *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 813–14 (6th Cir. 2020) (finding it relevant to "consider[] the role of the speaker, the substance of the comments, and the nexus to the adverse employment action to determine the probative value of discriminatory statements at the pretext stage.").

However, unlike *Sharp,* where the comment at issue was made to explain the reason for the plaintiff's termination, here the alleged statements were randomly made by various persons, and with the exception of the July 2022 discussion, are not connected to decisions concerning Ritter. This is a critical distinction made by both federal and state courts. *Blizzard,* 698 F.3d at 287 (discriminatory comments unrelated to the adverse action "do not constitute evidence of discrimination"); *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 393 (6th Cir. 2009) (same); *Byrnes v. LCI Commc'n Holdings Co.,* 77 Ohio St. 3d 125, 129 (1996) (characterizing comment about Alzheimer's disease as "insensitive," but holding employee must still prove a causal link between statements and prohibited act); *EEOC v. Clay Printing Co.*, 955 F.2d 936, 942 (4th Cir.

27

1992) (comments about "young blood" and "attract[ing] newer, younger people" did not support inference of discrimination because "[the] future realization of the potential of an enterprise lies principally with those who will be in positions of leadership and responsibility in the future."); *Sondhi v. Lockheed Missiles & Space Co.,* 62 F.3d 1425 (9th Cir. 1995) (Plaintiff "offered no evidence to indicate that any older employees were disadvantaged by [executive's memorandum about] the importance of attracting the next generation of engineers."); *Vesprini v. Shaw Cont. Flooring Servs., Inc.*, 315 F.3d 37, 42 (1st Cir. 2002) (comments by 57-year old supervisor that "the time had come for [plaintiff] to step back and let the young stallions run the business" as the "next generation" were "benign").

To be actionable, there must be a nexus between the statements and the decision-maker's action. *Wood v. Town of Warsaw, N.C.,* 914 F. Supp. 2d 735, 742-43 (E.D.N.C. 2012) (granting defendants summary judgment despite finding a supervisor used ageist statements in termination meeting, such as "modern department," "old school," " new century," "next generation," and "younger blood", because, *inter alia*, such "comments (alone or in combination with all evidence in the case) do not raise a genuine issue of material fact" that the stated termination reasons were pretextual); *see also Bell v. Raytheon Co.*, No. 3:08-cv-0702, 2009 WL 2365454, at *7 (N.D. Tex. July 31, 2009) (mention of  "next generation" does not constitute sufficient evidence of age discrimination where statement was not proximate or related to the employment decision); *Wilson v. L&B Realty Advisors, LLP*, No. 3:20-cv-2059, 2022 WL 102564, at *7 (N.D. Tex. Jan. 11, 2022) ("Smith's mention of the 'next gen' … did not refer to age. Rather, he was informing Wilson of the importance of executives like Wilson providing succession plans in order for the 'next gen' to see how supervisors envision their departments running after they retire….").

The evidence, viewed in the light most favorable to Ritter, is far too isolated and benign to plausibly show a general corporate bias favoring younger workers. Considering the use of

28

such terms—alone or in combination with all evidence in the case—does not raise a genuine issue of material fact that SEC's proffered reasons were pretextual. "The nonmoving party ... cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Wood*, 914 F. Supp. 2d at 739 (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)).

Here, a reasonable factfinder would have to draw multiple substantial inferences upon each other to try to connect those notions to adverse acts against Ritter. *See Gorbe v. City of Lathrup Vill.,* No. 17-11782, 2021 WL 1212406, at *7 (E.D. Mich. Mar. 31, 2021) (finding similar comments "general, vague, or ambiguous"); *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 708 (6th Cir. 2008) (citing *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524-25 (6th Cir. 2007) (statement employee was "too old" to handle a specific account was not evidence he was terminated because of age). Ritter fails to demonstrate an inference of discrimination on the basis of age, by pointing to the corporate use of terms like "long runway."

Similarly, Ritter takes issue with the Schindler Career Development Program (SCDP). A global-wide initiative created in Switzerland, SCDP was designed to develop "bench strength" by hiring recent college graduates (typically, but not always, younger workers), and groom them for leadership roles. (R. 18-1, PageID 515; R. 22, PageID 995-96, 1036, R. 23, PageID 1676). Ritter challenges this program as further evidence of discrimination against an older workforce. But such programs are not, in and of themselves, discriminatory. *Missouri v. Starbucks Corp.,* No. 4:25-cv-00165, 2026 WL 309714, at *17 (E.D. Mo. Feb. 5, 2026) (citing *Bostock v. Clayton Cnty.*, 590 U.S. 644, 681 (2020)) (discrimination requires proof the adverse action negatively affected terms, conditions, or benefits of employment)). Moreover, it appears just one comparator (Timmons) was a participant, and as noted in footnote 14, *supra,* there is no indication Ritter actually applied for the Kansas City TVP position for which she was selected.

29

Pointing to this program, without more to demonstrate any relevant nexus, does not aid Ritter's age discrimination claims.

### B. Retaliation

The ADEA, like Ohio law, prohibits employers from retaliating against employees. 29 U.S.C. § 623(d); Ohio Rev. Code § 4112.02(I). Consequently, it is illegal under both federal and state law to retaliate against another person for "opposing" discrimination or making a charge, testifying, assisting, or "participating" in any manner in an investigation, proceeding, or hearing. *Id.; see also Scott v. Potter,* 182 F. Appx. at 524. To establish a prima facie case of retaliation under either law, a plaintiff must first show that "[]he engaged in a protected activity" through either opposition and/or participation. *Greer-Burger v. Temesi,* 116 Ohio St.3d 324 (2007) (citing *Canitia v. Yellow Freight Sys., Inc.,* 903 F.2d 1064, 1066 (6th Cir. 1990)).

Ritter asserts Bloom retaliated against him by telling the Interim SVP of HR not to reply to his email about the Pittsburgh TVP job because they were waiting on Ritter's signed severance agreement.[22] (R. 18-1, PageID 487-88; R. 18-2, PageID 6471; R 19-2, PageID 910; R. 24, PageID 1718; R. 24-7, PageID 1797-98). But in asserting this alleged harm, the only claimed acts of opposition are Ritter's responses to alleged inquiries about his retirement plans and his July 2022 email to Bloom.

The Court accepts these facts as true, but finds they do not rise to the level of protected activity for ADEA or Chapter 4112 purposes. Opposition requires "proof of an overt stand against suspected illegal discriminatory action." *Coch v. Gem Indus.,* No. L-04-1357, 2005 WL 1414454, at *5 (Ohio Ct. App. June 17, 2005) (quoting *Comiskey v. Auto. Indus. Action Grp.,* 40 F. Supp.2d 877, 898 (E.D. Mich. 1999)). In other words, an employee "may not invoke the

---

[22]    The Court concurs with SEC that Ritter abandoned a different retaliation claim regarding contested unemployment benefits, upon learning this was due to a third-party vendor's error. (*See* R. 16, PageID 103).

protections of the Act by making a vague charge of discrimination." *Fox v. Eagle Distrib. Co.,* 510 F.3d 587, 591 (6th Cir. 2007) (holding an employee's allegation that manager is a racist was not protected activity under the ADEA as it was too vague to constitute opposition) (quoting *Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1313 (6th Cir. 1989)). *See also Willoughby v. Allstate Ins. Co.,* 104 Fed. Appx. 528, 531 (6th Cir. 2004) (rejecting claim that a letter with vague references about unhappy Caucasian employees constituted protected activity).

Specifically, "[i]n order to receive protection under the ADEA, a plaintiff's expression of opposition must concern a violation of the ADEA." *Fox v. Eagle Distrib. Co.,* 510 F.3d 587, 591 (6th Cir. 2007) (statements to customer that upper management was out to get him and he was going to sue did not constitute opposition). Here, Ritter specifically said, "[i]t was disheartening to hear that I do not fit in the next generation of leaders in SEC's eyes." (R. 16-2, PageID 177; R. 17-1, PageID 278-79; R. 17-2, PageID 1015; R. 22-1, PageID 1198-99). Substantially lacking is evidence that Ritter specifically complained or expressed a belief that SEC was discriminating against him by not hiring him for available TVP roles. The email does not contain the words age or discrimination, or other words intimating such. Nor does Ritter express a protest, complaint, or intention to file an internal or external complaint, or otherwise challenge the alleged comment.

In addition to lack of protected activity, Ritter's claims fail for lack of causation. The requisite causal link in retaliation cases is equally as stringent as in age cases. The employee must prove the employer's adverse action would not have occurred "but for" his or her opposition or participation. *Univ. of Texas Sw. Med. Ctr. v. Nassar,* 570 U.S. 338, 339 (2013). So even if Ritter could establish he engaged in opposition to unlawful ADEA activity, which he has not, his response to Bloom's future retirement inquiries occurred from six months to a year prior to the RIF, and are therefore too speculative and remote in time to establish the requisite causal connection. *Baker v. The Buschman Co.,* 127 Ohio App.3d 561, 568 (Ohio Ct. App. 1998) (one-

31

year gap insufficient to show causal connection); *Reeves v. Digital Equip. Corp.*, 710 F. Supp. 675, 677 (N.D. Ohio 1989) (no causal connection where there was a three month gap); *Cooper v. City of North Olmsted*, 795 F.2d 1265, 1272–1273 (6th Cir. 1986) (four months insufficient to support an inference of retaliation).

Further, there is simply no evidence to support a claim that SEC refused to give Ritter a third permanent TVP role because he told Bloom he can't ask about future retirement. And even if Ritter's exclamation that he was "disheartened to hear" constituted opposition—which it does not—there is no evidence that links his email to any of the "lost" positions, which all, except the 2022 Pittsburgh TVP position, involved hiring decisions made before the July 6, 2022 conversation.

With respect to Pittsburgh, by the time that position was open, Jennifer Bowen, now the SVP for Area North, was the decision-maker, not Bloom. And Bowen had determined, based on meeting Ritter twice, she would not hire him into a TVP role. (*See* FN 10, *supra*). Furthermore, while Ritter challenges the timing of Bloom telling HR not to respond, the record is replete with evidence to suggest Bloom was trying to aid Ritter with his career at SEC, not hurt him. He created a floating TVP position for Ritter, then met with him regularly. He coached Ritter, trying, along with HR, to direct Ritter down a different SEC career path in which he could re-brand his reputation or re-invent himself. He inquired about positions for Ritter with other SEC managers. For months, he considered whether to RIF Ritter's position, which suggests this decision was not an easy one to make. When Ritter was still an employee, both Yurchuk and Bloom told him he would not be considered for any TVP positions, they explained why, and they suggested various opportunities for him to purse to further his career within the company. And by the time the Pittsburgh position was open, the RIF decisions had already been made and executed and Ritter was no longer employed. So again, the evidence fails to establish a genuine issue of material fact

32

that but for Bloom's retirement inquiries and comments concerning next generational leaders, Plaintiff would have gotten the TVP job.[23]

As with age discrimination claims, upon establishment of a *prima facie* case of retaliation, the burden of production shifts to the defendant to articulate a non-discriminatory reason for the adverse employment action, with the burden returning to plaintiff to establish pretext. *Ladd v. Grand Trunk W. R.R., Inc.,* 552 F.3d 495, 502 (6th Cir. 2009). But for the reasons outlined above, the Court need not continue the analysis, because Ritter fails to demonstrate a triable material issue of fact regarding his retaliation claim under federal and state discrimination laws.

## IV.    <u>CONCLUSION</u>

In order to prevail in an employment discrimination case, the plaintiff must prove discriminatory intent. "It is true that it is very difficult to prove what the state of a man's mind at a particular time is, but if it can be ascertained it is as much a fact as anything else." *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716-717 (1983) (quoting *Eddington v. Fitzmaurice*, 29 Ch. Div. 459, 48. (1885)). After an extensive review of the record, the Court finds no evidence Paul Bloom harbored a discriminatory intent or carried out any bias-motivated action against Plaintiff James Ritter, who was approximately the same age as he. (R. 17-1, PageID 293).

Ritter was qualified for the position of TVP, having performed it for years. But as is the

---

[23]     It appears Ritter relies on the fact he was contemplating his severance as an element of a retaliation case. But a number of courts have held consideration of a severance package does not constitute protected activity or an adverse action. *E.E.O.C. v. SunDance Rehab. Corp.,* 466 F.3d 490, 502 (6th Cir. 2006); *Hansen v. Vanderbilt Univ.,* 961 F. Supp. 1149, 1153 (M.D. Tenn. 1997); *Davis v. Precoat Metals,* 328 F.Supp.2d 847, 849, 852-53 (N.D. Ill. 2004); *Barriera v. Bankers Trust,* No. 98 Civ. 3641, 2003 WL 22387099, at *8 (S.D.N.Y. Oct. 20, 2003); *Miller v. Eby Realty Group,* 241 F.Supp.2d 1247, 1255 (D. Kan. 2003). And given these facts and under such circumstances, this Court concurs.

situation in many corporations, perception is 9/10's reality, and Ritter's reputation—post-Optimus—was not positive. This was known to him and conveyed to him in September 2021, when he was told he would not be considered for another TVP position and counseled on other career opportunities within the company. And Ritter, acknowledging his reputation was close to being in the toilet, conceded these facts.

Despite suggestions from his boss and the head of HR to seek out other opportunities within the company to "re-brand" himself, it simply appears Ritter continued to apply for TVP positions. And ultimately at the end of his career with SEC, Ritter was the only person in a temporary floating TVP role, a position company leaders determined was no longer needed. Is this the way a corporation should treat a longstanding employee? That is a question for another forum, because this Court's job is to determine whether there is sufficient evidence to create a triable issue of material fact that SEC illegally discriminated against Ritter based on his age and/or in retaliation for engaging in protected activity. And that answer—based on the law and facts construed most favorably for him—is, No.

The Court hereby GRANTS Defendant's Motion for Summary Judgment (R. 16) and dismisses this case for the foregoing reasons.

IT IS SO ORDERED.

Date: April 24, 2026

s/ *David A. Ruiz*
David A. Ruiz
United States District Judge

34